## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————————
)
SHEILA A. BLOOM                                    )
1712 Cedarpark Rd.                                 )
Annapolis, MD 21401                                )
                                                   )
                        Plaintiff,                 )
                                                   )
        v.                                         )          **Complaint and Jury Demand**
                                                   )
FRANCIS J. HARVEY, SECRETARY          )
UNITED STATES ARMY                       )
101 Army Pentagon                                  )
Washington, DC 20310-0101                    )
                                                   )
        and                                        )
                                                   )
CARL A. STROCK, COMMANDER          )
U.S. ARMY CORPS OF ENGINEERS     )
441 G Street, N.W.                                 )
Washington, DC 20314-1000                    )
                                                   )
                        Defendants.               )
———————————————————————————)

## COMPLAINT

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended*, 42 U.S.C. §§ 2000e *et seq.;* the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 2302; and the Whistleblower Protection Act ("WPA"), 5 U.S.C. §§ 1211-1215, 1218-1219, 1221-1222, 7702-7703.

## JURISDICTION AND VENUE

**1.**  This Court has jurisdiction over all of Plaintiff's Title VII claims pursuant to 42 U.S.C. §§ 2000e-5(f)(3), 2000e-5(g), 2000e-16(c), and 29 C.F.R. § 1614.407(b) and (d).

2. Venue is proper in the United States District Court for the District of Columbia pursuant to 42 U.S.C. §§ 2000e-5(f)(3) because the unlawful employment practices alleged occurred in the District of Columbia.

3. This Court has jurisdiction over the Plaintiff's whistleblower and Civil Service Reform Act claims pursuant to Section 7702 of title 5 of the United States Code, which governs the prosecution of "mixed case" claims, and Section 7703 of title 5 of the United States Code. Plaintiff initially elected to proceed with her "mixed case" claims before the Agency's Equal Opportunity Employment Office ("EEO Office").

4. Plaintiff exhausted her administrative remedies before pursuing her claims in federal court.

5. Plaintiff exhausted her administrative remedies regarding the first complaint filed with the Agency's EEO Office on March 29, 2003 (Army Docket No. CEHEC03APR0010) (with amendments having been filed between July and November of 2003). When the EEO Office took no action, Plaintiff filed a request for hearing before the Equal Employment Opportunity Commission ("EEOC") on April 12, 2004. The EEOC has not issued a final decision in over two years. Plaintiff has exhausted her administrative remedies as set forth under 29 C.F.R. §1614.407(d) as more than 180 days has passed since she filed her request for hearing with the EEOC.

6. A second complaint was timely filed on July 30, 2004 (Army Docket No. ARCEHEC04AUG0019) (with amendments having been filed on December 27, 2004 and February 3, 2005). Pursuant to 29 C.F.R. § 1614.106(e)(2), Plaintiff exhausted her administrative remedies as to this amended complaint as more than 360 days has elapsed since the complaint was initially filed.

7. A third "mixed case" complaint was timely filed on July 30, 2004 (Army Docket No. ARHEC04JUN0015). Pursuant to 29 C.F.R. § 1614.302(d)(1)(i), Plaintiff exhausted her administrative remedies with respect to this complaint as more than 120 day has elapsed since that complaint was filed.

8. A fourth complaint was timely filed on February 10, 2005 (Army Docket No. ARCEHC04NOV8536). Pursuant to 29 C.F.R. § 1614.407(b), this court has jurisdiction over the fourth complaint as more than 180 days has elapsed since that complaint was filed.

9. Jurisdiction over Plaintiff's "whistleblower" claim rests with the district court as the acts of discrimination comprising the whistleblower claim directly relate to and specifically stem from the very acts, discrimination and reprisals Plaintiff raised in the four complaints identified above that Plaintiff initiated before the Agency's EEO Office. Pursuant to 29 C.F.R. § 1614.302(a)(1), Title VII claims that directly relate to claims brought under the WPA are defined to constitute a "mixed case" complaint. Pursuant to 1614.302(d)(1)(i), the district court has jurisdiction to hear Plaintiff's "mixed case" complaints.

## **PARTIES**

10. Plaintiff, Ms. Sheila A. Bloom, is a citizen of the United States and a resident of the state of Maryland. She is employed by the United States Army Corps of Engineers as a GS-13-301 Facilitator.

11. The United States Army is an Agency of the United States Government and is headquartered in Virginia. United States Army is an executive agency within the meaning of 42 U.S.C. § 2000e-16(a).

12. The United States Army Corps of Engineers ("USACE") is headquartered in Washington, D.C. The USACE is an executive agency within the meaning of 42 U.S.C. § 2000e-16(a).

**13.** Defendant Francis J. Harvey is the Secretary of the United States Army.  He is being sued in his official capacity and in his capacity under 42 U.S.C. § 2000e-16(c).

**14.** Defendant Carl A. Strock is the commander of the United States Army Corps of Engineers as Chief of Engineers.  Defendant Strock is being sued in his official capacity and in his capacity under 42 U.S.C. § 2000e-16(c).

## **FACTS**

**15.** Plaintiff was hired by Defendant, the United States Army Corps of Engineers ("USACE"), in December of 1986 as a Civil Engineer.

**16.** Between December of 1986 and September of 2002, Plaintiff's career and individual performance as an employee of the USACE excelled.  She received numerous promotions; outstanding performance appraisals; performance based Within Grade Increases; Quality Step Increases; cash awards; prestigious leadership training; and letters and notes of commendation and recognition from inside and outside of the USACE.

**17.** In June 1996, Plaintiff was permanently promoted to Formerly Used Defense Site (FUDS) Program Manager in the Environmental Management Branch in Programs and Project Management in the Baltimore District Corps office.  Shortly after assuming this position, Plaintiff began to uncover major flaws at the FUDS site known as "Site Spring Valley."

**18.** Between 1996 and 1998, Plaintiff raised significant concerns to her supervisors with respect to deficiencies in the Spring Valley project that exposed specific and substantial dangers to public health and safety and the environment.  Plaintiff's concerns involved the drinking water reservoir, foundational issues, inadequate sample collection, inaccurate baseline mapping, inadequate chemical constituents testing, improper methods being used (Data Quality Objectives), and deficiencies with how the samples were analyzed through the site.

Plaintiff noted several violations of the Community Right to Know Act, the Clean Water Act, Clean Air Act, and Comprehensive Environmental Response Compensation and Liability Act (CERCLA). She also disclosed conflicts of interest created by rehiring Parsons Engineering to reevaluate its own project under the Operation Safe Removal conducted between 1993 and 1995.

**19.** In retaliation for raising these concerns, Plaintiff was informed that she was no longer going to function as the Spring Valley Project Manager and was going to be replaced.

**20.** After leaving the Baltimore District Corps office, Plaintiff was selected for a key position funded by EPA for the Baltimore City Showcase Community. USACE attempted to interfere with this transfer and informed Plaintiff that she was not allowed to accept the assignment. Said interference was taken as a result of Plaintiff having raised serious concerns related to the Spring Valley site. After EPA and Baltimore City officials objected due to the fact that Plaintiff was the top candidate for the position, USACE capitulated and allowed her to accept the assignment.

**21.** In early 2002, Plaintiff's concerns became the subject of a Department of Justice ("DOJ") investigation. The DOJ wanted to interview the Plaintiff and contacted Susan Platt of the Baltimore District Corps office and Ken Powers of the USACE Office of General Counsel to get in touch with her. In April, Ms. Bloom revealed her concern with these two parties prior to the interview with DOJ. Thereafter, it became known to the command structure of USACE that Plaintiff was willing to go forward and expose the concerns that she raised internally, which would embarrass the USACE command, and did so.

**22.** Significant retaliation against Plaintiff followed shortly thereafter during Plaintiff's assignment to the Command Planning Group, which resides under the Chief of Engineers

Executive Office.  Plaintiff protected disclosures related to the Spring Valley project were a contributing factor in the adverse personnel actions taken against her.

23. Plaintiff further attempted to bring forward her concerns to the USACE Inspector General ("IG"), who reports to the commanding general. The USACE IG and the Plaintiff met and discussed the issues of Spring Valley. The IG refused to conduct sensing sessions until November 2002.

24. In early 2002, Plaintiff was offered a position as a GS-13-301 Strategic Planner within the newly formed Command Planning Group (CPG), which resides under the Chief of Engineers Executive Office.  She accepted the position and reported for duty in April of 2002.

25. Plaintiff was provided with a Permanent Change of Station (PCS) reflecting her new job title (Strategic Planner), grade (GS-13) and series 0301.

26. Between June of 2002 and August of 2002, three GS-15 managers were hired in the CPG and referred to themselves as "the management team": Mr. Bruce Elliot (Deputy), Mr. Sean Wachutka, and Ms. Toni Trombecky.

27. In July 2002, at a work-related party held in the home of USACE Colonel Saia, Ms. Trombecky's husband made inappropriate sexual advances towards Plaintiff. He assumed another name, Sam, and did not tell Plaintiff that his wife was her supervisor. At the end of the party, Ms. Bloom was saying goodbye to her supervisors and other people while standing outside, including Ms. Trombecky.  Mr. Trombecky grabbed Ms. Bloom and pulled her towards him into a hug and said "take me away from them, they don't understand me."

28. Within several days of this incident with Mr. Trombecky, Ms. Trombecky trapped Ms. Bloom in her cubicle and berated her.

**29.** Beginning in September of 2002 and continuing through the present, Plaintiff has been subjected to a pattern of discrimination in the terms and conditions of her employment by the management team.

**30.** After Mr. Wachutka's arrival he continually presented Ms. Bloom with job announcements on a daily basis.

**31.** Following the party at Colonel Saia's house in July 2002, Ms. Trombecky accused Plaintiff of intending to undermine her authority on numerous occasions. In September during a meeting with Ms. Trombecky, she refused to assign Plaintiff work that she had extensive experience in, namely Environmental and International work. During the meeting she belittled Plaintiff in front of her male colleagues.

**32.** On November 15, 2002, the day before the work-related Holiday Party, Ms. Trombecky approached Plaintiff and asked her if she was going to the party. Plaintiff said she thought she was going. Ms. Trombecky then stated that her husband was going to joke with Plaintiff at the party. Plaintiff asked Ms. Trombecky why he was going to joke with her. Ms. Trombecky stated in a very sexual tone, "Oh he really likes you."

**33.** On November 16, 2002, Plaintiff attended the Holiday Party at Mr. Elliott's house. There were approximately 30-40 people gathered in a large open kitchen living room area. When Plaintiff walked in, Mr. Trombecky immediately approached her, grabbed her and tickled her under her arms near her breasts. Plaintiff immediately pushed him away and said, "Don't you ever touch me again." Mr. Trombecky asked Plaintiff what was wrong and she told him that he inappropriately tickled her and to never touch her again. Plaintiff moved to the basement, and both Mr. and Mrs. Trombecky followed her there. Ms. Trombecky

approached Plaintiff and was overly nice. Mr. Trombecky stood against the wall and stared at Plaintiff for a long time.  Plaintiff left the party a short time later.

34. Despite the contractual transfer agreement, Plaintiff's official transfer SF-50 Personnel Action indicated that her title was "Facilitator."  Plaintiff continually requested to have her title changed from "Facilitator" to "Strategic Planner," however, the management team refused to do so.

35. The failure to change her job title to "Strategic Planner" ultimately resulted in Plaintiff being designated as an "overhire" (i.e., surplus employee) under the USACE 2012 reorganization that took effect in January of 2004.

36. Defendant still refuses to change Plaintiff's less distinguished "Facilitator" job title to the more distinguished and prestigious "Strategic Planner" job title.

37. Between January 21-24, 2003, during an International Conference, Ms. Trombecky subjected Ms. Bloom to harassment.

38. Between January 21-24, 2003, Ms. Bloom, and another USACE employee (Anil Patel) reported Ms. Trombecky's harassment to Mr. Elliott.

39. On February 3, 2003, Ms. Trombecky informed Ms. Bloom that her Quality Step Increase (QSI) would not be given for her excellent performance appraisal in 2002, despite Colonel Saia's approval of the increase.  Ms. Trombecky and Mr. Elliott changed this award after telling Ms. Bloom that it had been approved.

40. On February 4, 2003, Ms. Trombecky verbally abused Ms. Bloom during a First Quarterly Performance Review Meeting for her Total Army Performance Evaluation System (TAPES) 2003.

**41.** On February 4, 2003, immediately after the meeting with Ms. Trombecky, Ms. Bloom met with Mr. Elliott and requested that he remove her from the hostile work environment created by Ms. Trombecky.

**42.** Ms. Bloom requested that she be able to work from home on February 5, 6, and 10, 2003 and Ms. Trombecky complied with her leave request.  However, Ms. Trombecky then harassed Plaintiff by requiring her to take the leave without pay for the work she performed on February 6.

**43.** On February 11, 2003, Ms. Trombecky (who was not Plaintiff's supervisor of record) called three GAO Security staff (two of whom were uniformed and armed) to escort Plaintiff through the building in front of her colleagues.  Ms. Trombecky forced Plaintiff to meet with her in a conference room without representation, while the armed guards were posted outside.  Ms. Trombecky proceeded to issue Plaintiff a Letter of Reprimand based upon false, misleading, and defaming accusations.

**44.** In February of 2003, Plaintiff initiated an informal Administrative Grievance.

**45.** Between February 11, 2003 and April 22, 2003, Ms. Bloom continued to seek redress and a hearing with the Chain of Command (LTG Flowers; MG VanWinkle; Colonel Schroedel; Bruce Elliott; and the IG (LTC Kevin Elliot and LTC Willie James) only to be continuously denied.

**46.** On March 5, 2003, Ms. Trombecky instigated a Threat Assessment Team "to figure out what to do with Sheila."  On information and belief, the use of a Threat Assessment Team was illegal and improper.

**47.** On March 7, 2003 Ms. Bloom was told by Ms. Trombecky that her position would not be changed from a Facilitator to a Strategic Planner

**48.** On March 10, 2003, the Plaintiff was denied a transfer out of the Command Planning Group by Colonel Schroedel.

**49.** On March 10, 2003, Ms. Bloom submitted the official Administrative Grievance package to personnel and a second copy was submitted to LTG Flowers for review and determination.

**50.** On March 10, 2003, Ms. Bloom wrote an e-mail to LTG Flowers and informed him that as a result of the psychological and physical harm flowing from the continuing harassment, Ms. Bloom had to take leave between March 11 and April 8, 2003.

**51.** On March 13, 2003, Ms. Bloom was notified that on March 5, 2003, she had been charged with AWOL for 3.75 hours and received a notice of indebtedness for this AWOL. Ms. Trombecky accused Ms. Bloom of being with her colleague Mr. Robert Roedel and Personnel on March 5, 2003, the day Mr. Roedel was terminated.  In fact, Ms. Bloom was with Colonel Schroedel and Colonel Saia.

**52.** On May 29, 2003, Ms. Bloom filed her first Formal EEO Complaint (Docket No. CEHEC03APR0010) with amendments having been filed between July and November of 2003).

**53.** On April 9, 2003, Ms. Trombecky referred Plaintiff for Mandatory Employee Assistance Program and Mandatory Anger Management Program without a valid basis for doing so.

**54.** On April 25, 2003, Ms. Trombecky targeted Plaintiff, unlike her male counterparts, and insisted that she provide a fixed schedule of arrival and departure, even though Plaintiff had a Variable Work Schedule under the Alternative Work Schedule.

**55.** In late April of 2003, Ms. Trombecky targeted Plaintiff, unlike her male counterparts, and instructed her that: 1) she had to sign in and out on a timesheet by the minute for time in, lunch in, lunch out, and time out; 2) she had to sign in and out on a board anytime that she

was away from her desk for more than thirty minutes; and 3) she had to immediately leave any meeting that went longer than expected and call Ms. Trombecky to let her know when she would be returning to her desk.

56. In May of 2003, Ms. Trombecky and Mr. Elliot denied Plaintiff's request to attend the International Association of Facilitators Conference and Training, despite the fact that Plaintiff was the only official Facilitator within the CPG and attending the conference was included in her TAPES and Individual Development Plan (IDP).

57. MG VanWinkle directed Colonel Schroedel to find a permanent assignment for Ms. Bloom outside of the CPG prior to his transfer.  Colonel Schroedel worked with Personnel to locate a suitable assignment and requested Ms. Bloom's input.  Out of this process, Colonel Schroedel arranged, with Plaintiff's approval, to transfer Plaintiff permanently into the Research and Development (R&D) Directorate as a Program Manager.  On May 1, 2003, Ms. Bloom reported to R&D but was then told that she had to return to CPG and wait. The agreement to transfer Plaintiff was reversed and, upon Plaintiff's return, Ms. Trombecky immediately began to  harass Plaintiff.

58. In an e-mail dated May 7, 2003, Plaintiff alerted Lieutenant General Robert Flowers that she believed she was being discriminated and retaliated against as a result of her whistleblower activity in connection with Spring Valley and her prior EEO protected activities.  LTG Flowers failed to take any corrective action whatsoever.

59. On June 13, 2003, Ms. Trombecky wrote a derogatory and aggressive e-mail to Ms. Bloom's supervisor, Dr. Sudol.

60. On June 14, 2003, Ms. Bloom went to her doctor and found out that Ms. Trombecky had called the doctor's office requesting information on Ms. Bloom.

**61.** On July 3, 2003, Ms. Trombecky instructed the CPG Timekeeper to change Ms. Bloom's leave from annual leave to restored annual leave without Ms. Bloom's knowledge or approval.

**62.** On July 24, 2003, Ms. Bloom's paid 8 hours of sick leave was changed to non-paid leave without her knowledge or approval.

**63.** Between January 2003, and August 2003 Ms. Bloom was denied access to her Official Personnel Folder (OPF) by the Director of Human resources.

**64.** Ms. Bloom proceeded up the chain of command and requested removal and permanent transfer from the hostile work environment both to the Chief of Staff (Colonel Michael Walsh) and to the Deputy Commanding General (MG Robert Griffin).  Then, on October 2, 2003, Ms. Bloom met with the Chief of Engineers LTG Flowers and requested to be removed from the hostile work environment and was denied.

**65.** In November 2003 the Inspector General (IG) began an investigation.  The IG scheduled and conducted individual sessions with each employee in the CPG and assured them that they would be afforded non-attribution and that the report would be provided to everyone in January 2004.  Ms. Bloom was not given a copy.

**66.** On December 19, 2003, Mr. Wachutka and Mr. Elliott unilaterally issued Ms. Bloom TAPES without input from Ms. Bloom and informed Ms. Bloom that she was a Facilitator.

**67.** As a result of the psychological and physical harm flowing from the continuing harassment, Ms. Bloom had to take leave between December 19, 2003 through January 12, 2004.

**68.** Plaintiff filed a second complaint with the Agency's EEO Office on July 30, 2004 (Army Docket No. ARCEHEC04AUG0019) (with amendments having been filed on December 27, 2004 and February 3, 2005).

**69.** Plaintiff filed a third complaint which the EEO Office accepted as a "mixed case" complaint. This complaint was timely filed on July 30, 2004 (Army Docket No. ARHEC04JUN0015).

**70.** On August 4, 2004, Ms. Bloom was issued an unwarranted 30 working day suspension between August 9, 2004 and September 20, 2004.

**71.** Plaintiff's security clearance was obtained in 1993-1994 while she was employed with the U.S. Air Force at Andrews Air Force Base. The clearance was good for ten years.

**72.** After transferring to HQ USACE in March 2002, Plaintiff was told that her clearance would be renewed due to the fact that she worked for the Commanding General and could be in meetings that required clearance.

**73.** She later learned that clearances were only renewed for jobs that required such clearances. She notified her supervisors that her job description would have to be altered to require such clearance. They assured her that her job description would be altered to reflect as much. Plaintiff later discovered that the clearance was not renewed and was going to expire. She again notified her supervisors, who did nothing.

**74.** In August 2004, Mr. Wachutka informed Plaintiff that it was her responsibility to renew her clearance that this was one reason why she was not being placed from an overhire position into a permanent position. According to Army regulations, Mr. Wachutka was responsible for ensuring her clearance did not expire.

**75.** Many key positions currently being advertised at HQ USACE and at other USACE offices as well as in other federal agencies require clearance. Plaintiff requested to reapply for a clearance, however, Mr. Wachutka informed her that he was not going to require a clearance for her position and refused to allow her to reapply. This limited Plaintiff's mobility for placement into available openings from the overhire position.

**76.** Allowing Plaintiff's security clearance to expire has impacted her ability to transfer into other positions and obtain promotions or assignments to key projects.

**77.** A security clearance is critical to getting high level positions in government and in prestigious organizations. A clearance requires an in depth review of an individual's life and history. The cost for a clearance is high such that organizations take great care in ensuring that employees maintain their clearances in the event that they need to get higher clearances.

**78.** Performance appraisals are key to retention during reorganizations and Reductions in Force (RIF).  The employee has higher ranking with higher performance appraisals of record. Each performance appraisal adds points to an employee's overall score for retention status in the event of a RIF or reorganization.

**79.** Performance appraisals are also critical to obtaining transfers into other positions.

**80.** Between February 2003 and December 19, 2003, Ms. Bloom never received a signed and approved written performance plan by the supervisor or senior rater. Ms. Bloom repeatedly requested to meet with management to establish a written performance plan and was ignored or declined face to face meetings.  Without a performance plan, a legitimate performance appraisal was not possible. The last legitimate performance appraisal of Ms. Bloom was completed in November 2002.  She was a Top Performer (1) on a scale of 1-5, 1 being the highest.

**81.** On October 22, 2004, Plaintiff was issued a Failing (5) performance appraisal.

**82.** The failure to issue Plaintiff legitimate performance appraisals denied her the opportunity to transfer into another position and be promoted.

**83.** Plaintiff was placed on a Performance Improvement Plan (PIP).

**84.** The management team subjected Plaintiff to ongoing and continual harassment, including: a) issuing her a letter of reprimand based on false and defamatory accusations in a hostile and humiliating manner; b) giving her an unwarranted 30 working day suspension; c) refusing to change her job title and correct her job description; d) verbally abusing her in front of her colleagues; e) failing to give her a legitimate performance review after November 2002; f) allowing her security clearance to lapse; g) presenting her with job announcements; h) stopping or transferring her work assignments; i) refusing to assign her valid work; j) forcing her to move from her work station; k) changing a Quality Step Increase award despite previous approval of the award; l) falsely accusing her of financial wrongdoing for money collected for a conference she managed; m) refusing to meet with her; n) requiring her to perform menial and meaningless tasks (such as emptying binders and separating supplies); o) refusing to allow her to facilitate workshops despite her previous success and external request for her services; p) refusing to allow her to see her employee work folder; q) falsely charging her for AWOL; r) placing her on Progressive Discipline; s) threatening her to prevent her from continuing to report the harassment to the Chain of Command; t) sending an e-mail to hundreds of Plaintiff's professional contacts that falsely accused Plaintiff of breaking regulations that were never promulgated; u) forcing her to take sick leave when she had prior approval to telecommute; v) changing her sick leave to non-paid leave without her knowledge or approval; w) violating her medical privacy; x) failing to follow TAPES regulations and OPM rules on performance management when they unilaterally issued Plaintiff TAPES without her input; y) attempting to prevent her from seeking assistance from the EEO office; z) inappropriately reviewing her grievance package in violation of Army Administrative Grievance Procedures; aa) refusing to reassign her upon her request; bb)

reversing her pre-approved transfer to Research and Development; cc) issuing Plaintiff a

Failing (5) performance appraisal on October 22, 2004; dd) placing Plaintiff on a

Performance Improvement Plan (PIP) without prior counseling or backup documentation; ee)

denying her requests to attend training and conferences; ff) failing to enroll her in the

voluntary leave transfer program; and gg) denying her advance sick leave on July 16, 2004.

**85.** The stress resulting from the continuous harassment caused and/or contributed to serious

health problems for Plaintiff.

**86.** Plaintiff timely filed a fourth complaint on February 10, 2005 (Army Docket No.

ARCEHC04NOV8536).

<u>**COUNT I (Hostile Work Environment)**</u>

**87.** Plaintiff incorporates by reference paragraphs 1-86, inclusive and all allegations contained

therein.

**88.** The hostile work environment the plaintiff was subjected to included the following acts of

ongoing and continual harassment in violation of Title VII: a) issuing her a letter of

reprimand based on false and defamatory accusations in a hostile and humiliating manner; b)

giving her an unwarranted 30 working day suspension (43 days); c) refusing to change her

job title and correct her job description; d) verbally abusing her in front of her colleagues; e)

failing to give her a legitimate performance review after November 2002 or follow Agency

prescribed performance process; f) allowing her security clearance to lapse; g) presenting her

with job announcements; h) stopping or transferring her work assignments; i) refusing to

assign her valid work; j) forcing her to move from her work station; k) changing a Quality

Step Increase award despite previous approval of the award; l) falsely accusing her of

financial wrongdoing for money collected for a conference she managed; m) refusing to meet

with her; n) requiring her to perform menial and meaningless tasks (such as emptying binders and separating supplies); o) refusing to allow her to facilitate workshops despite her previous success and external request for her services; p) refusing to allow her to see her employee work folder; q) falsely charging her for AWOL; r) placing her on Progressive Discipline; s) threatening her to prevent her from continuing to report the harassment to the Chain of Command; t) sending an e-mail to hundreds of Plaintiff's professional contacts that falsely accused Plaintiff of breaking regulations that were never promulgated; u) forcing her to take sick leave when she had prior approval to telecommute; v) changing her sick leave to non-paid leave without her knowledge or approval; w) violating her medical privacy; x) failing to follow TAPES regulations and OPM rules on performance management when they unilaterally issued Plaintiff TAPES without her input; y) attempting to prevent her from seeking assistance from the EEO office; z) inappropriately reviewing her grievance package in violation of Army Administrative Grievance Procedures; aa) refusing to reassign her upon her request; bb) reversing her pre-approved transfer to Research and Development; cc) issuing Plaintiff a Failing (5) performance appraisal on October 22, 2004; dd) placing Plaintiff on a Performance Improvement Plan (PIP); ee) denying her requests to attend training and conferences; ff) failing to enroll her in the voluntary leave transfer program; and gg) denying her advance sick leave on July 16, 2004.

**89.** As a direct and proximate result of the hostile work environment, plaintiff has suffered damages, including but not limited to physical and emotional harm, damage to reputation and other monetary damages in an amount to be proven at trial.

## COUNT II (Retaliation)

**90.** Plaintiff incorporates by reference paragraphs 1-89, inclusive and all allegations contained

therein.

**91.** Since lodging her first complaint with a supervisor between January 21-24, 2003, Ms. Bloom

has been the subject of retaliation by her supervisors.

**92.** In April, 2002, Ms. Bloom was provided with a Permanent Change of Station (PCS)

affirming that her title should have been changed from Facilitator to Strategic Planner.

However, Ms. Bloom's employers refused to change her title from Facilitator to Strategic

Planner.

**93.** Denial of a pre-approved job title correction forced Ms. Bloom to retain the job title of

"Facilitator" as opposed to "Strategic Planner."  The job title of "Facilitator" is one that is

less distinguished than the title of "Strategic Planner."  Despite the fact that there was no

change in salary or grade in relation to this title correction, the job title, being less

distinguished, hampered how Ms. Bloom was viewed and utilized by her co-workers and

would also affect her future job aspirations.

**94.** The failure of USACE to correct Ms. Bloom's job title also caused her to become an

"overhire" (i.e., surplus employee) under the USACE 2012 reorganization in January 2004.

**95.** Not modifying Ms. Bloom's job title is an ongoing problem.  Her employers continue to

refuse to change her "less distinguished" job title of "Facilitator" to the more distinguished

title of "Strategic Planner."

**96.** Ms. Bloom was denied an already approved QSI.  Denying Ms. Bloom her already approved

QSI was a significant change in her benefits of employment.

97. On March 13, 2003, Ms. Bloom was notified that she was charged for 3.75 hours of AWOL that allegedly took place on March 5, 2003.

98. Ms. Trombecky accused Ms. Bloom of being with her colleague Mr. Robert Roedel and Personnel on March 5, 2003, the day Mr. Roedel was terminated. In fact, Ms. Bloom was with Colonel Schroedel and Colonel Saia.

99. The effect of being charged for 3.75 hours of AWOL on Ms. Bloom's pay and benefits amounts to a loss of $157.50 at her pay rate of $42 per hour. It further impacted her retirement benefits.

100. MG VanWinkle directed Colonel Schroedel to find a permanent assignment for Ms. Bloom outside of the CPG prior to his transfer. Colonel Schroedel worked with Personnel to locate a suitable assignment and requested Ms. Bloom's input. Out of this process, Colonel Schroedel arranged to have Ms. Bloom permanently transferred into the Research and Development (R&D) Directorate as a Program Manager. On May 1, 2003, Ms. Bloom reported to R&D and was told to return to CPG and wait. The agreement was reversed. Ms. Trombecky immediately began harassing Ms. Bloom upon her return.

101. On July 24, 2003 Ms. Bloom's eight hours of paid sick leave was changed to non-paid leave without her knowledge or approval. The reversal of Ms. Bloom's paid sick leave deprived Ms. Bloom of $336.00 of her earned pay at her pay rate of $42 per hour.

102. Ms. Bloom was given notice of her 30 working day suspension on August 4, 2004 and served her suspension from August 9, 2004 to September 20, 2004. During this time Ms. Bloom was deprived of her wages and the immediate use of those wages. Given the length of time and Ms. Bloom's pay grade, this suspension caused Ms. Bloom to lose $10,080.00 in wages (240 hours at a pay grade of $42.00). Moreover, Plaintiff was denied numerous

significant benefits of employment, including Thrift Savings (401K) matching, Federal

Employment Retirement Benefit System (FERS) benefits, health benefits, leave accrual, and

long-term care insurance benefits.

103.    Between July 2004 and February 2005, Ms. Bloom was denied her request for advanced

sick leave, a privilege of employment available to all employees, by her employers.

104.    Performance appraisals are key to retention during reorganizations and Reductions in

Force (RIF).  The employee has higher ranking with higher performance appraisals of record.

Each performance appraisal adds points to an employee's overall score for retention status in

the event of a RIF or reorganization.

105.    Between February 2003 and December 19, 2003, Ms. Bloom never received a signed and

approved written performance plan by the supervisor or senior rater. Without a performance

plan, a legitimate performance appraisal was not possible. The last legitimate performance

appraisal of Ms. Bloom was completed in November 2002.  She was a Top Performer (1) on

a scale of 1-5, 1 being the highest.

106.    On October 22, 2004, Plaintiff was issued a Failing (5) performance appraisal. As a

result, Plaintiff was ineligible for a cash award in both 2003 and 2004.

107.    The failure to issue Plaintiff legitimate performance appraisals denied her the opportunity

to transfer into another position and be promoted.

108.    The Plaintiff was placed on a Performance Improvement Plan (PIP) without prior

counseling or written documentation. As a result, Plaintiff was ineligible for a cash award.

109.    A security clearance is critical to getting positions in government in high level and

prestigious organizations. A clearance requires an in depth review of an individual's life and

history. The cost for a clearance is high such that organizations take great care in ensuring that employees maintain their clearances in the event that they need to get higher clearances.

110.    The Plaintiff's security clearance was obtained in 1993-1994 while she was employed with the U.S. Air Force at Andrews Air Force Base. The clearance was good for ten years.

111.    After transferring to HQ USACE in March 2002, Plaintiff was told that her clearance would be renewed due to the fact that she worked for the Commanding General and could be in meetings that required clearance.

112.    She later learned that clearances were only renewed for jobs that required such clearances.  She notified her supervisors that her job description would have to be altered to require such clearance. They assured her that her job description would be altered to reflect as much. Plaintiff later discovered that the clearance was not renewed and was going to expire. She again notified her supervisors, who did nothing.

113.    In August 2004, Mr. Wachutka informed Plaintiff that it was her responsibility to renew her clearance that this was one reason why she was not being placed from an overhire position into a permanent position. According to Army regulations, Mr. Wachutka was responsible for ensuring her clearance did not expire.

114.    Many key positions currently being advertised at HQ USACE and at other USACE offices as well as in other federal agencies require clearance. Plaintiff requested to reapply for a clearance, however, Mr. Wachutka informed her that he was not going to require a clearance for her position and refused to allow her to reapply. This limited Plaintiff's mobility for placement into available openings from the overhire position.

115.    Allowing Plaintiff's security clearance to expire will impact her ability to transfer into other positions, obtain promotions or assignments to key projects.

**116.**    As a direct and proximate result of the retaliation, plaintiff has suffered damages, including but not limited to physical and emotional harm, damage to reputation and other monetary damages in an amount to be proven at trial.

### COUNT III (Sex Discrimination)

**117.**    Plaintiff incorporates by reference paragraphs 1-116, inclusive and all allegations contained therein.

**118.**    In July 2002, at a work-related party held in the home of USACE Colonel Saia, Ms. Trombecky's husband made inappropriate sexual advances towards Plaintiff. He assumed another name, Sam, and did not tell Plaintiff that his wife was her supervisor. At the end of the party, Ms. Bloom was saying goodbye to her supervisors and other people while standing outside, including Ms. Trombecky.  Mr. Trombecky grabbed Ms. Bloom and pulled her towards him into a hug and said "take me away from them, they don't understand me."

**119.**    Within several days of this incident with Mr. Trombecky, Ms. Trombecky trapped Ms. Bloom in her cubicle and berated her.

**120.**    Following the party at Colonel Saia's house in July 2002, Ms. Trombecky accused Plaintiff of intending to undermine her authority on numerous occasions. In September during a meeting with Ms. Trombecky, she refused to assign Plaintiff work that she had extensive experience in, namely Environmental and International work.  During the meeting she belittled Plaintiff in front of her male colleagues.

**121.**    On November 15, 2002, the day before the work-related Holiday Party, Ms. Trombecky approached Plaintiff and asked her if she was going to the party.  Plaintiff said she thought she was going.  Ms. Trombecky then stated that her husband was going to joke with Plaintiff

at the party. Plaintiff asked Ms. Trombecky why he was going to joke with her.  Ms. Trombecky stated in a very sexual tone, "Oh he really likes you."

122.    On November 16, 2002, Plaintiff attended the Holiday Party at Mr. Elliott's house.  There were approximately 30-40 people gathered in a large open kitchen living room area.  When Plaintiff walked in, Mr. Trombecky immediately approached her, grabbed her and tickled her under her arms near her breasts.  Plaintiff immediately pushed him away and said, "Don't you ever touch me again."  Mr. Trombecky asked Plaintiff what was wrong and she told him that he inappropriately tickled her and to never touch her again. Plaintiff moved to the basement, and both Mr. and Mrs. Trombecky followed here there.  Ms. Trombecky approached Plaintiff and was overly nice. Mr. Trombecky stood against the wall and stared at Plaintiff for a long time.  Plaintiff left the party a short time later.

123.    On April 25, 2003, Ms. Trombecky targeted Plaintiff, unlike her male counterparts, and insisted that she provide a fixed schedule of arrival and departure, even though Plaintiff had a Variable Work Schedule under the Alternative Work Schedule.

124.    In late April of 2003, Ms. Trombecky targeted Plaintiff, unlike her male counterparts, and instructed her that: 1) she had to sign in and out on a timesheet by the minute for time in, lunch in, lunch out, and time out; 2) she had to sign in and out on a board anytime that she was away from her desk for more than thirty minutes; and 3) she had to immediately leave any meeting that went longer than expected and call Ms. Trombecky to let her know when she would be returning to her desk.

125.    In May of 2003, Ms. Trombecky and Mr. Elliot denied Plaintiff's request to attend the International Association of Facilitators Conference and Training, despite the fact that Plaintiff was the only official Facilitator within the CPG and the conference was in her

TAPES and Individual Development Plan (IDP).  Upon information and belief, two of

Plaintiff's male counterparts were allowed to plan to attend.

126.    Despite being provided with a Permanent Change of Station (PCS), which affirmed that

her title should have been changed from Facilitator to Strategic Planner, the management

team targeted Plaintiff by refusing to follow the PCS and change her job title.  The failure of

USACE to correct her job title and job description caused Plaintiff to become an "overhire"

(i.e., surplus employee) during USACE 2012 reorganization in January 2004.  Plaintiff's

male counterparts either held Strategic Planner or other titles and therefore did not become

overhires during the reorganization.

127.    As a direct and proximate result of the sex discrimination, plaintiff has suffered damages,

including but not limited to physical and emotional harm, damage to reputation and other

monetary damages in an amount to be proven at trial.

<u>COUNT IV (Whistleblower Discrimination)</u>

128.    Plaintiff incorporates by reference paragraphs 1-127, inclusive and all allegations

contained therein.

129.    In June 1996, Plaintiff was permanently promoted to Formerly Used Defense Site

(FUDS) Program Manager in the Environmental Management Branch in Programs and

Project Management in the Baltimore District Corps office.  Shortly after assuming this

position, Plaintiff began to uncover major flaws at the FUDS site known as "Site Spring

Valley."

130.    Between 1996 and 1998, Plaintiff raised significant concerns to her supervisors with

respect to deficiencies in the Spring Valley project that exposed specific and substantial

dangers to public health and safety and the environment.  Plaintiff's concerns involved the

drinking water reservoir, foundational issues, inadequate sample collection, inaccurate

baseline mapping, inadequate chemical constituents testing, improper methods being used

(Data Quality Objectives), and deficiencies with how the samples were analyzed through the

site. Plaintiff noted several violations of the Community Right to Know Act, the Clean Water

Act, Clean Air Act, and Comprehensive Environmental Response Compensation and

Liability Act (CERCLA). She also disclosed conflicts of interest created by rehiring Parsons

Engineering to reevaluate its own project under the Operation Safe Removal conducted

between 1993 and 1995.

**131.**    In retaliation for raising these concerns, Plaintiff was informed that she was no longer

going to function as the Spring Valley Project Manager and was going to be replaced.

**132.**    After leaving the Baltimore District Corps office, Plaintiff was selected for a key position

funded by EPA for the Baltimore City Showcase Community. USACE attempted to interfere

with this transfer and informed Plaintiff that she was not allowed to accept the assignment.

Said interference was taken as a result of Plaintiff having raised serious concerns related to

the Spring Valley site. After EPA and Baltimore City officials objected due to the fact that

Plaintiff was the top candidate for the position, USACE capitulated and allowed her to accept

the assignment.

**133.**    In early 2002, Plaintiff's concerns became the subject of a Department of Justice ("DOJ")

investigation. The DOJ wanted to interview the Plaintiff and contacted Susan Platt of the

Baltimore District Corps office and Ken Powers of the USACE Office of General Counsel to

get in touch with her. In April, Ms. Bloom revealed her concern with these two parties prior

to the interview with DOJ. Thereafter, it became known to the command structure of

25

USACE that Plaintiff was willing to go forward and expose the concerns that she raised internally, which would embarrass the USACE command, and did so.

134.    Significant retaliation against Plaintiff followed shortly thereafter during Plaintiff's assignment to the Command Planning Group, which resides under the Chief of Engineers Executive Office.  Plaintiff protected disclosures related to the Spring Valley project were a contributing factor in the adverse personnel actions taken against her.

135.    Plaintiff further attempted to bring forward her concerns to the USACE Inspector General ("IG"), who reports to the command  The USACE IG refused to return Plaintiff's phone calls.

136.    In an e-mail dated May 7, 2003, Plaintiff alerted Lieutenant General Robert Flowers that she believed she was being discriminated and retaliated against as a result of her whistleblower activity in connection with Spring Valley and her prior EEO protected activities.  LTG Flowers failed to take any corrective action whatsoever.

137.    As a direct and proximate result of the whistleblower discrimination, Plaintiff suffered damages and is entitled to injunctive relief and an award of monetary damages under the WPA.

### COUNT V (Violation of Merit System Protection - 30 Day Suspension)

138.    Plaintiff incorporates by reference paragraphs 1-137, inclusive and all allegations contained therein.

139.    Plaintiff was given notice of her 30 working day suspension (43 days) on August 4, 2004 and served her suspension from August 9, 2004 to September 20, 2004.  During this time Ms. Bloom was deprived of her wages and the immediate use of those wages.  Given the length of time and Ms. Bloom's pay grade, this suspension caused Ms. Bloom to lose $10,080.00 in

wages (240 hours at a pay grade of $42.00). In addition thereto, Plaintiff was denied

numerous significant benefits of employment, including Thrift Savings (401K) matching,

Federal Employment Retirement Benefit System (FERS) benefits, health benefits, leave

accrual, and long-term care insurance benefits.

**140.**    Plaintiff did not engage in the misconduct alleged to be the basis of the 30 day

suspension.

**141.**    In the alternative, to the extent that Plaintiff did engage in such misconduct, her response

was provoked by the Defendant.

**142.**    The 30 working day suspension (43 days) was overly harsh.

**143.**    Plaintiff was otherwise subjected to disparate treatment.

**144.**    The Defendant failed to properly consider the mitigation factors, as set forth in *Douglas*

*v. Veterans Administration*, 5 MSPR 280, 305-06 (1981), in determining the penalty for

Plaintiff.

**145.**    As a direct and proximate result of the Defendants violations of the Merit Systems

Protections, Plaintiff suffered damages and is entitled to injunctive relief and an award of

monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for all relief permitted under Title VII, the Civil Service

Reform Act, and the Whistleblower Protection Act, against Defendants, including, but not

limited to:

a)    Preliminary and permanent injunctive relief and declaratory relief as appropriate;

b)    Preliminary and permanent injunctive relief prohibiting future retaliation against Plaintiff

for lawful opposition to employment practices prohibited by Title VII;

c)  An Injunction prohibiting Defendants from taking any disciplinary, adverse or prohibited personnel action against Plaintiff;

d)  A Judgment declaring that Defendants' conduct towards Plaintiff is in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; the Civil Service Reform Act, 5 U.S.C. § 2302; and the Whistleblower Protection Act, 5 U.S.C. §§ 1211-1215, 1218-1219, 1221-1222, 7702-7703.

e)  All relief entitled to the Plaintiff pursuant to Plaintiff's Title VII, Civil Service Reform Act and Whistleblower Protection Act claims;

f)  Compensatory damages as permitted by law, the exact amount to be determined at trial

g)  Compensation for damages to future employment;

h)  An award of the costs and fees incurred by Plaintiff in bringing this action, including those incurred at the administrative level, as well as reasonable attorneys and expert witness fees, and pre-judgment and post-judgment interest.

i)  Such other and further relief as the Court may deem just and proper.


**JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE**

Respectfully submitted,


_____
Michael D. Kohn, #425617
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C.  20007
Phone: (202) 342-6980
Fax: (202) 342-6984
Attorney for Plaintiff

September 12, 2005