**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**SHEILA A. BLOOM,**

**Plaintiff,**

**v.**

**JOHN McHUGH, et al.,**

**Defendants.**

---

**Civil Action 05-1804 (RCL)**

**MEMORANDUM OPINION**

Sheila A. Bloom, a former employee of the United States Army Corps of Engineers

proceeding pro se,[1] brings this action against John McHugh, Secretary of the Army, and Robert

L. Van Antwerp, Jr., Commander of the Army Corps of Engineers.[2]  Bloom alleges harassment

and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

*seq.*; the Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978) (codified in

scattered sections of 5 U.S.C.); and the Whistleblower Protection Act, Pub. L. No. 101-12, 103

Stat. 16 (1989) (codified in scattered sections of 5 U.S.C.).   Before the Court is defendants'

motion to dismiss her complaint in part and for summary judgment [Dkt. # 44].[3]  Upon

---

[1]      At the time she filed her complaint and during the early stages of this litigation,
Bloom was represented by counsel.   In September 2007, the Honorable Henry H. Kennedy, Jr.
granted her counsel's motion to withdraw.  *See* Min. Entry for Sept. 6, 2007.  Since that time,
Bloom has represented herself.

[2]      Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current
Secretary of the Army has been substituted for former Secretary Francis J. Harvey, and the
current Commander of the Army Corps of Engineers has been substituted for former
Commander Carl A. Strock.

[3]      Although the motion refers to "Defendant" in the singular and omits "et al." from
the caption, perhaps because the government argues that Commander Antwerp is an improper
party to the Title VII claims, the Court treats the motion as brought on behalf of both the

consideration of the motion, the opposition thereto, and the record of this case, the Court

concludes that defendants' motion should be granted.[4]

## I. BACKGROUND

Bloom was hired by the Army Corps of Engineers as a civil engineer in 1986. Compl.

¶ 15. In June 1996, she began serving as a program manager in the Corps's Baltimore District

office, working on, among other things, the "Spring Valley" project. Compl. ¶ 17.[5] Bloom

states that between 1996 and 1998 she raised with her supervisors concerns about environmental

and public health dangers at the Spring Valley site. Compl. ¶ 18. In retaliation, Bloom

contends, the Corps replaced her as the program manager at the Spring Valley site. Compl. ¶ 19.

Bloom also alleges that the Corps initially attempted to interfere with her transfer to another

position, which she was later permitted to accept. Compl. ¶ 20.

In 2002, the U.S. Department of Justice allegedly began investigating the Spring Valley

site and interviewed Bloom. Compl. ¶ 21. Bloom contends that before her interview, she

informed individuals in the Army Corps's Baltimore District office and its Office of the General

_____

Secretary and the Commander.

[4]    In opposing defendants' motion, Bloom presents a myriad of documents, all but one of which merely restate motions that the Court has previously denied, *see* Order of Nov. 24, 2009 [Dkt. # 41], and none of which provide a basis for the Court to reconsider any of its previous rulings. Accordingly, this opinion does not address those other documents, and focuses on Bloom's 86-page "Motion to Dismiss Defendant's Motion to Dismiss," which responds to defendants' arguments in support of their motion.

[5]    This project involved an area in the northwestern part of Washington, D.C. that the government previously used for research and testing of chemical agents, equipment, and munitions. *See Spring Valley, Washington, D.C., Project Overview*, U.S. ARMY CORPS OF ENGINEERS, http://www.nab.usace.army.mil/Projects/Spring%20Valley/ (last visited Dec. 1, 2011).

Counsel about her concerns regarding the Spring Valley site, after which it allegedly "became known to the command structure" of the Corps that Bloom planned to move forward with raising her complaints externally.  Compl. ¶ 21.  Bloom also contends that she spoke with the Corps Inspector General about the Spring Valley site in November 2002.  Compl. ¶ 23.

Earlier that year, Bloom had accepted a position within the Corps's Command Planning Group.  Compl. ¶¶ 22, 24.  In this position, she worked under a team of three managers: Bruce Elliott, Sean Wachutka, and Toni Trombecky (collectively, the "management team").  Compl. ¶ 26.  Bloom contends that she experienced "significant retaliation" during this assignment as a result of her "protected disclosures" regarding the Spring Valley site.  Compl. ¶ 22.

Bloom also alleges that the management team subjected her to a "pattern of discrimination" beginning in September 2002.  Compl. ¶ 29.  Specifically, Bloom says that Wachutka "continually presented" her with job announcements.  Compl. ¶ 30.  Trombecky allegedly accused Bloom of attempting to undermine her authority, belittled Bloom in front of her male colleagues, and refused to assign Bloom work in areas where she had experience. Compl. ¶ 31.  The management team also purportedly refused to change Bloom's title from "facilitator" to the "more distinguished and prestigious" title of "strategic planner," which allegedly resulted in her being designated an "overhire" in the Corps's January 2004 reorganization.  Compl. ¶¶ 34–36.

In July 2002, Bloom attended a Corps work party where, she says, Trombecky's husband "made inappropriate sexual advances" toward her.  Compl. ¶ 27.  She contends that Trombecky's husband "grabbed . . . Bloom and pulled her towards him into a hug," saying "'take me away

3

from them, they don't understand me.'" Compl. ¶ 27. Bloom also alleges that, several days later, Trombecky "trapped" her in her cubicle and "berated her." Compl. ¶ 28.

In November 2002, Trombecky allegedly told Bloom that her husband was going to "joke" with Bloom at the Corps's upcoming holiday party and said, "in a very sexual tone . . . '[o]h he really likes you.'" Compl. ¶ 32. At the party, Trombecky's husband allegedly "grabbed [Bloom] and tickled her arms near her breasts." Compl. ¶ 33. Bloom says that he then "stood against the wall and stared at [her] for a long time." Compl. ¶ 33.

In January 2003, Trombecky allegedly "subjected . . . Bloom to harassment" at a work conference, prompting Bloom to report Trombecky's harassment to Elliott. Compl. ¶¶ 37–38. After lodging this complaint, Bloom contends that she became "the subject of retaliation by her supervisors." Compl. ¶ 91. Specifically, on February 3, 2003, Trombecky allegedly informed Bloom that her Quality Step Increase would not take effect, even though Bloom had previously been told that the increase had been approved. Compl. ¶ 39. On February 4, 2003, Trombecky allegedly "verbally abused" Bloom, prompting Bloom to request that Elliott remove her from the "hostile work environment." Compl. ¶¶ 40–41.

On February 11, 2003, Trombecky purportedly had security staff escort Bloom through the building and then issued her a letter of reprimand, after which Bloom initiated an informal administrative grievance. Compl. ¶¶ 43–45. Bloom contends that her efforts to seek redress through the Corps's chain of command were "continuously denied." Compl. ¶ 45. On March 13, 2003, Bloom purportedly received notification that she had been charged with being away without leave ("AWOL") for 3.75 hours, causing her to lose $157.50 in "pay and benefits." Compl. ¶¶ 51, 99.

4

In April 2003, Trombecky allegedly referred Bloom to a mandatory anger management program.  Compl. ¶ 53.  Trombecky also allegedly "targeted [Bloom], unlike her male counterparts," by requiring her to: (i) provide a fixed arrival and departure schedule; (ii) sign in and out on a timesheet for her time in, time out, and lunch hours; (iii) sign in and out any time she was away from her desk for more than thirty minutes; and (iv) alert Trombecky any time she attended a meeting that went longer than expected.  Compl. ¶¶ 53–54.  In May 2003, Trombecky and Elliot purportedly denied Bloom's request to attend a conference.  Compl. ¶ 56.  In June 2003, Trombecky allegedly wrote a derogatory e-mail about Bloom and requested information from Bloom's physician.  Compl. ¶¶ 59–60.

In August 2004, Bloom received a thirty-working-day suspension.  Compl. ¶ 70.  The specific bases for the suspension were "communicating a threat, failure to follow instructions, and lack of candor."  Def.'s Mem. in Supp. of Mot. to Dismiss in Part and for Summ. J. ("Defs.' Mem.") at 18.  Bloom contends that, as a result, she lost $10,080 in wages and was denied other benefits, including matching contributions to her retirement account, health benefits, leave accrual, and insurance benefits.  Compl. ¶ 139.  Bloom says that she did not engage in the misconduct used as the basis of her suspension, or in the alternative, that any misconduct was "provoked."  Compl. ¶¶ 140–141.

Bloom contends that in August 2004, Wachutka refused to allow her to reapply for a security clearance because "he was not going to require a clearance for her position."  Compl. ¶ 75.  She alleges that the lack of a security clearance "limited [her] mobility for placement into available openings from the overhire position" and "impacted her ability to . . . obtain promotions or assignments to key projects."  Compl. ¶¶ 75–76.

5

In October 2004, Bloom received a "[f]ailing (5) performance appraisal."  Compl. ¶ 81.

As a result, Bloom was placed on a performance improvement plan and "was ineligible for a

cash award in both 2003 and 2004."  Compl. ¶¶ 106, 108.  Bloom argues that the Corps's failure

to issue her "legitimate performance appraisals" from November 2002 to October 2004 "denied

her the opportunity to transfer into another position and be promoted."  Compl. ¶¶ 82, 107.

Bloom contends that throughout this period, she repeatedly complained about her

working environment to her supervisors and requested to be transferred.  *See* Compl. ¶¶ 29–86.

Specifically, Bloom says that she complained of Trombecky's "harassment" to Elliott in January

2003 and asked Elliott to remove her "from the hostile work environment" in February 2003.

Compl. ¶¶ 38, 41.  Between February 2003 and April 2003, Bloom allegedly filed informal and

formal administrative grievances, to no avail.  Compl. ¶¶ 44–45, 49.  In March 2003, Bloom's

request for a transfer was allegedly denied.  Compl. ¶ 48.  In May 2003, Bloom avers that she

reported to a different Corps division for a permanent transfer, but the transfer was subsequently

reversed.  Compl. ¶ 57.  Bloom contends that she alerted Lieutenant General Robert Flowers in

May 2003 that she was being discriminated and retaliated against as a result of "her

whistleblower activity" regarding the Spring Valley site and "her prior EEO protected

activities"; Flowers allegedly took no action.  Compl. ¶ 58.  In October 2003, Bloom's request to

be removed from her position was again denied.  Compl. ¶ 64.

Between May 2003 and February 2005, Bloom filed four complaints with the Army

Equal Employment Opportunity Office.  *See* Compl. ¶¶ 52, 68–69, 86.  In September 2005, she

commenced this action.  From May 2008 through May 2009, this action was stayed pending the

Court of Appeals' resolution of the dismissal of a related civil action, *Bloom v. Geren*, No. 07-

0979 (D.D.C. Jan. 18, 2008).  The D.C. Circuit resolved that appeal by summary affirmance, *see*

*Bloom v. Geren*, 2009 WL 1953632 (D.C. Cir. Feb. 3, 2009), and the defendants then brought

this motion to dismiss and for summary judgment.

## II.  LEGAL STANDARDS

### A.  Judgment on the Pleadings Under Rule 12(c)

Defendants move to dismiss some of Bloom's claims under Federal Rule of Civil

Procedure 12(b)(6), but such a motion is untimely because they have already filed an answer.

*See* FED. R. CIV. P. 12(b) ("A motion asserting any [Rule 12(b)] defenses must be made before

pleading if a responsive pleading is allowed.").  Because, however, the standards for a Rule

12(b)(6) motion and a Rule 12(c) motion for judgment on the pleadings are identical, courts

routinely construe motions to dismiss that are filed after a responsive pleading as motions for

judgment on the pleadings, and this Court will do likewise.  *See, e.g.*, *Langley v. Napolitano*, 677

F. Supp. 2d 261, 263 (D.D.C. 2010); *Lenox Hill Hosp. v. Shalala*, 131 F. Supp. 2d 136, 140

(D.D.C. 2000).

Accordingly, defendants' motion will be granted only if Bloom's complaint fails to plead

"enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  To state a plausible claim, the complaint need not contain detailed

factual allegations, but it must recite facts sufficient to at least "raise a right to relief above the

speculative level . . . on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)."  *Id.* at 555.  A "pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

1949 (2009) (quoting *Twombly*, 550 U.S. at 555).  At bottom, a complaint must contain

sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*[6]

## B.    Summary Judgment Under Rule 56

Defendants move for summary judgment on another of Bloom's claims.  A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its burden, the non-moving party must then establish that a genuine dispute as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet its burden, the non-moving party must show that "the evidence is such that a reasonable jury could return a verdict" in its favor.  *Anderson*, 477 U.S. at 248.  Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine dispute for trial.  *See* FED. R. CIV. P. 56(c)(1), (e); *Celotex*, 477 U.S. at 322 n.3.  If the evidence is "merely colorable"

---

[6]     Although the pleadings of pro se plaintiffs are held to less stringent standards than those of trained attorneys, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), Bloom does not benefit from that more lenient standard because, although she now proceeds pro se, her complaint was drafted by an attorney.  *See supra* note 1.

or "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at

249–50.

### III.  ANALYSIS

Bloom's complaint presents five counts.  Two allege violations of the Whistleblower

Protection Act and the Civil Service Reform Act.  The remaining three allege violations of Title

VII: sex discrimination, retaliation for engaging in protected activity, and the creation of a

hostile work environment.  The Court begins by addressing Bloom's claim under the

Whistleblower Protection Act.[7]

### A.        Bloom's Whistleblower Protection Act Claim is Barred By Res Judicata

Defendants contend that Count IV of Bloom's complaint, titled "Whistleblower

Discrimination," is barred by the doctrine of res judicata.  Defs.' Mem. at 5–6.  They argue that

Count IV is duplicative of claims that Bloom raised before the Federal Circuit in 2007, *see*

*Bloom v. Dep't of the Army*, 245 F. App'x 953 (Fed. Cir. 2007), as well as those presented to this

Court in *Bloom v. Geren*.  Defs.' Mem. at 5–6.  Bloom does not address the Federal Circuit

appeal, but argues that Count IV is "distinctly different" from the claims she raised in *Bloom v.*

*Geren*.  Pl.'s Mot. to Dismiss Def.'s Mot. to Dismiss ( "Pl.'s Opp'n") at 3.  Bloom's argument is

unavailing.[8]

---

[7]        Because the Court concludes that defendants have earned summary judgment on,
or the dismissal of, all of Bloom's claims, it does not reach the Secretary's argument that he is
the sole proper defendant for Bloom's Title VII claims.

[8]        In resolving Rule 12(c) motions, courts may take judicial notice of records of
prior litigation.  *Does I Through III v. District of Columbia*, 238 F. Supp. 2d 212, 216 (D.D.C.
2002).

Res judicata, or claim preclusion, holds that "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 323–24 (1971)).  Two claims involve the same cause of action if they share a common nucleus of fact. *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002).  In short, the doctrine prevents parties "from relitigating issues that were *or could have been raised*" in a prior action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (emphasis added).

Bloom's Whistleblower Protection Act claim is clearly barred by her prior litigation. Bloom here alleges that she "raised significant concerns to her supervisors" regarding a number of "major flaws" with the Spring Valley project site. Compl. ¶¶ 129–30.  As an alleged result of these disclosures, Bloom experienced several retaliatory actions. Compl. ¶¶ 131–34.  Similarly, Bloom argued before the Federal Circuit (where she was appealing the dismissal of her complaint by the Merit Systems Protection Board) that "she suffered reprisals in violation of the Whistleblower Protection Act . . . as a result of protected disclosures she made in connection with the 'Spring Valley' project." *Bloom*, 245 F. App'x at 954.  Although Bloom describes some retaliatory actions here that she did not raise before the Federal Circuit, her new allegations "could have been raised" in that court, *Allen*, 449 U.S. at 94, and the claims she raised there plainly share a nucleus of fact with those she asserts here. *See Drake*, 291 F.3d at 66.  The Federal Circuit's dismissal of Bloom's Whistleblower Protection Act claims—essentially because they were frivolous, *see* 245 F. App'x at 955–56—constituted "a final, valid judgment

on the merits" of those claims.  *See Smalls*, 471 F.3d at 192.  Accordingly, Bloom may not now

relitigate those claims, or others that she could have raised in that action.  Her Whistleblower

Protection Act claim will therefore be dismissed.[9]

## B.    Summary Judgment as to Bloom's Civil Service Reform Act Claim

The defendants next argue that the Court should grant summary judgment in their favor

on Count V, which alleges that Bloom's thirty-day suspension in August 2004 violated the Civil

Service Reform Act.  Bloom was suspended for lack of candor, issuing threats, and failure to

follow instructions.  Def.'s Mem. Ex. 28 at 1–2.  The Civil Service Reform Act provides a

grievance process and remedies to federal employees who believe that they have experienced

prohibited personnel practices, which include personnel actions that are arbitrary, discriminatory,

or based on personal favoritism.  *See* 5 U.S.C. §§ 2301–2302.   Before addressing the

defendants' arguments, the Court will briefly clarify the procedural posture of this claim.

The Civil Service Reform Act allows an employee who has experienced a prohibited

personnel practice that was motivated by discrimination in violation of Title VII to file a "mixed

case" alleging violations of both the Civil Service Reform Act and Title VII.  A mixed case

complainant may file either a complaint with her agency's equal employment opportunity office

or a "mixed case appeal" directly with the Merit Systems Protection Board.  *See Butler v. West*,

164 F.3d 634, 638 (D.C. Cir. 1999); 29 C.F.R. § 1614.302(b).  If she elects the former route, the

complainant may appeal the agency's decision to the Merit Systems Protection Board or file a

---

[9]    This conclusion is reinforced by the decision in *Bloom v. Geren*, where Bloom
brought a claim for whistleblower discrimination based on nearly identical allegations.  Judge
Kennedy granted defendants' motion to dismiss that claim, finding that Bloom's "whistle blower
claim is barred by claim preclusion principles."  *Bloom v. Geren*, No. 07-0979 (D.D.C. Jan. 18,
2008) (order dismissing case).

civil action in federal court. *See* 29 C.F.R. §§ 1614.302(d)(1)(ii), 1614.302(d)(3), 1614.310(a). The same options are available if 120 days pass without a final decision by the agency. *See* 5 U.S.C. § 7702(e); *Butler*, 164 F.3d at 638.

Here, Bloom first filed a mixed case complaint regarding her thirty-day suspension with the Army's equal employment opportunity office. Compl. ¶¶ 7, 69. A month later, she filed a mixed case appeal with the Merit Systems Protection Board, which was dismissed without prejudice as premature because her EEO complaint was still pending. *See Bloom v. Dep't of the Army*, 2004 M.S.P.B. LEXIS 3025, at *4–6 (Oct. 20, 2004). The equal employment opportunity office, however, did not act on Bloom's complaint within 120 days. Compl. ¶ 7.

Bloom's Civil Service Reform Act claim thus arrives here in an unusual posture; neither the EEO office nor the Merit Systems Protection Board has addressed its merits. Nevertheless, district courts have subject-matter jurisdiction to review the Civil Service Reform Act component of a mixed case even absent a final agency decision on the merits. *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1042–44 (D.C. Cir. 2008). In such cases, the Court's review is *de novo*. *See id.* at 1043–44; *accord Seay v. TVA*, 339 F.3d 454, 472 (6th Cir. 2003).

To earn summary judgement on Bloom's Civil Service Reform Act claim, therefore, defendants must demonstrate that any reasonable jury would find the agency's reasons for suspending Bloom to be "supported by a preponderance of the evidence . . . and that the penalty imposed was reasonable." *Vickers v. Powell,* 493 F.3d 186, 191 (D.C. Cir. 2007) (citing 5 U.S.C. § 7701(c)(1)(B); *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981)). Defendants must also prove that the thirty-day suspension "promote[d] the efficiency of the [civil] service."

5 U.S.C. § 7513(a).  The Court will first address the evidence supporting the penalty, and then the propriety thereof.

### 1.    Evidence Supporting the Lack of Candor Charge

Defendants contends that Bloom's suspension was partially based on her lack of candor. Bloom allegedly made a number of untruthful statements to a supervisor in December 2003. Def.'s Mem. at 19–21.  According to memoranda written by both Bloom and her supervisor Wachutka, on December 19, Bloom announced to Wachutka that she planned to visit the Army's equal employment opportunity office.  Def.'s Mem. Ex. 28, Attach. 5 at 1–2; Def.'s Mem. Ex. 29 at 2.[10]  Wachutka asked whether Bloom had an appointment there; Bloom said that she did. Bloom then admitted that her appointment had actually been two days prior, but she had been unable to make it.  Def.'s Mem. Ex. 28 at 1–2; Def.'s Mem. Ex. 29 at 2.  After Wachutka confirmed that Bloom did not have an appointment with the EEO office for that day, Bloom allegedly told Wachutka that she had permission to go to there at any time to review her file. Def.'s Mem. Ex. 28, Attach. 5 at 2.  Wachutka again contacted the EEO office, which informed him that Bloom had not had an appointment on record for December 17 and that there was no standing invitation for Bloom to visit.  Def.'s Mem. Ex. 28, Attach. 5 at 2.

Defendants have offered evidence that Bloom responded untruthfully or evasively to a number of Wachutka's questions on December 19, 2003.  Bloom has introduced no evidence to the contrary, nor disputed that these events occurred substantially as described in defendants'

---

[10]    In Bloom's opposition brief, she states that she filed a second EEO complaint on December 19, 2003, but makes no mention of her interactions with Wachutka on that date.  *See* Pl.'s Opp'n at 26.  Accordingly, in recognition of Bloom's status as a pro se plaintiff, the Court incorporates Bloom's description of those events from Bloom's email, dated July 7, 2004, that rebutted the proposed 30-day suspension, attached as Exhibit 29 to defendants' motion.

exhibits.  Bloom does state broadly that the parties disagree about the facts of the case, *see* Pl.'s

Opp'n at 43, but a pro se plaintiff, like any other, cannot defeat summary judgment by making

mere allegations or denials that are unsupported by affidavits or other competent evidence.

*Prunte v. Universal Music Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010).  Further,

Bloom's own description of the events of December 19 asserts that Bloom first told Wachutka

that she had an appointment that afternoon at the EEO Office, and then later admitted that she

did not.  Def.'s Mem. Ex. 29 at 2.  Because a lack of candor charge may be proven by showing

that the employee failed "to disclose something that, in the circumstances, should have been

disclosed in order to make the given statement accurate and complete," *Ludlum v. Dep't of

Justice*, 278 F.3d 1280, 1284 (Fed. Cir. 2002), the Court finds defendants have met their

evidentiary burden with respect to the lack of candor charge.  *Cf. Smith v. Dep't of Interior*, 112

M.S.P.R. 173, 180–81 (2009) (finding that the agency had met its evidentiary burden to sustain a

lack of candor charge where the employee had admitted to "c[oming] up with" excuses for her

absences from work); *see also Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1433 (D.C.

Cir. 1996) (noting that "[t]he [Merit Systems Protection Board's] interpretation [of the Civil

Service Reform Act] is entitled to deference") (citing *Lovshin v. Dep't of Navy*, 767 F.2d 826,

840 (Fed. Cir. 1985) (en banc) (holding that "deference is appropriately given to the [Merit

Systems Protection Board's] interpretation" of the Civil Service Reform Act)).[11]

---

[11]     Because the lack of candor charge is supported by a preponderance of the
evidence and no reasonable juror could conclude otherwise, and, as explained below, is
sufficient to support the suspension, the Court will not consider whether defendants have
established a basis for the remaining charges of making a threat and failure to follow
instructions.  *See Leach v. Dep't of Veterans Affairs*, 107 M.S.P.R. 229, 232 (2007) (noting that
where one charge supports the penalty received, other charges need not be addressed); *Alvarado
v. Dep't of the Air Force*, 103 M.S.P.R. 1, 19–20 (2006) (same).

2.      **Nexus Between Adverse Action and the Efficiency of the Service**

Under the Civil Service Reform Act, an agency can take action against an employee "only for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a).  The "efficiency of the service" standard requires that there be a "nexus between the employee's misconduct and the work of the agency, *i.e.*, the agency's performance of its functions."  *Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009).  The Merit Systems Protection Board has held that "an agency has a right to expect its workers to be honest, trustworthy, and candid" and that a "lack of candor strikes at the very heart of the employer-employee relationship."  *Ludlum v. Dep't of Justice*, 87 M.S.P.R. 56, 68 (2000) (citing *Stein v. U.S. Postal Serv.*, 57 M.S.P.R. 434, 441 (1993)).  And the Federal Circuit has suggested that a sufficient nexus is established where the employee's misconduct occurred at work.  *Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1116 (Fed. Cir. 1987).  Here, defendants have shown that Bloom was dishonest and evasive with her supervisor, while at work.  That showing is sufficient to establish a nexus between the employee's misconduct and the efficiency of the service.  *See Probasco v. Dep't of the Air Force*, 2009 M.S.P.B. LEXIS 6354, at *24 (Sept. 29, 2009); *Ludlum*, 87 M.S.P.R. at 68.

3.      **Appropriateness of the Penalty Imposed**

The Court reviews an agency-imposed penalty under the Civil Service Reform Act only to determine if the agency considered all the relevant factors and exercised management discretion within tolerable limits of reasonableness.  *Douglas*, 5 M.S.P.R. at 306; *see also Dunn v. Dep't of the Air Force*, 96 M.S.P.R. 166, 170–71 (2004).  Accordingly, the Court's function is not to decide what penalty it would impose, but rather to ensure that the agency's judgment has

been properly exercised and that the penalty does not exceed the maximum limits of reasonableness.  *Kamahele v. Dep't of Homeland Sec.*, 108 M.S.P.R. 666, 670–71 (2008); *Douglas*, 5 M.S.P.R. at 306.

Bloom's complaint alleges that the suspension was overly harsh, that the agency failed to properly consider the required factors, as listed in *Douglas*, 5 M.S.P.R. 280,[12] and that Bloom was "otherwise subject to disparate treatment."  Compl. ¶¶ 142–144.  Defendants respond that the agency properly considered each of the *Douglas* factors and that the severity of the suspension was well within the bounds of reasonableness.  Defs.' Mem. at 28–29.  Defendants have the stronger position.

The evidence offered by defendants establishes that the agency properly considered all of the relevant factors before issuing Bloom's thirty-day suspension.  In an interview with an EEO counselor, Wachutka, the proposing official, stated that he had both considered the *Douglas* factors and consulted with the Army Corps's Human Resources department before deciding that

---

[12]     The *Douglas* factors are: (1) the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.  5 M.S.P.R. at 305–06.

Bloom's purported misconduct warranted a thirty-day suspension.  Def.'s Mem. Ex. 31 at 4.

Elliott, the deciding official, specifically stated in his "notice of decision" that he had "given full

consideration to all of the *Douglas* factors."  Def.'s Mem. Ex. 30 ¶ 2.  Elliott also completed a

"Supervisor's Checklist of *Douglas* Factor Considerations" in which each of the twelve listed

factors is followed by a handwritten notation indicating the application of the factor to the

situation at hand.  *See* Def.'s Mem. Ex. 33.[13]  In light of this uncontroverted evidence, the Court

concludes that the Corps properly considered all of the requisite factors.

The Court also finds that the severity of the thirty-day suspension was within the limits of

reasonableness.  Although the suspension was based on the agency's conclusion that Bloom had

committed all three of the offenses charged, the penalty cannot be viewed as anything other than

reasonable even if considered solely in relation to the lack of candor charge.  In evaluating the

reasonableness of a penalty, the Court considers first and foremost the nature and seriousness of

the misconduct and its relation to the employee's duties, position, and responsibilities.

*Singletary v. Dep't of the Air Force*, 94 M.S.P.R. 553, 559 (2003), *aff'd*, 104 F. App'x 155 (Fed.

Cir. 2004).  A lack of candor charge is a serious offense that "strikes at the heart of the

employer-employee relationship."  *Jackson v. Dep't of the Army*, 99 M.S.P.R. 604, 607 (2005).

That fact is reaffirmed by the agency's "Table of Penalties," which suggests that a first offense

for "exaggeration, concealment, [or] withholding of a material fact" warrants anything from a

written reprimand to removal.  *See* Def.'s Mem. Ex. 36 at 5–6.  Bloom provides no basis for the

---

[13]     Bloom contends, apparently because Elliot's checklist is dated "July 22," without
a year, that defendants have "provided false documents to support the false statements that Bruce
Elliott had properly considered the Table of Penalties or Douglas Factors when determining"
whether the 30-day suspension was appropriate. Pl.'s Opp'n at 45–46. This assertion is without
support and is contradicted by both a sworn affidavit from Elliott, Def.'s Reply Ex. 1 ¶¶ 3–6, and
the bases for the suspension listed on the form itself.

Court to conclude that her suspension for committing this significant offense was unreasonable. She claims that any misconduct on her part was "provoked" by officials at the agency, Compl. ¶ 141, but offers no evidence to support such a claim.[14]  The Court therefore finds that the imposition of a thirty-day suspension was a reasonable penalty and that no reasonable juror could conclude otherwise on this record.

### 4.      Bloom's Affirmative Defense of Disparate Treatment

Lastly, the Court turns to Bloom's contention that her suspension was motivated by disparate treatment.  Compl. ¶ 143.  Disparate treatment that would violate Title VII constitutes an affirmative defense under the Civil Service Reform Act that, if proven, requires a penalty to be overturned even if otherwise justified.  *See* 5 U.S.C. § 2302(b); 5 C.F.R. § 1201.56(a)(2)(iii), (b).  Defendants argue that Bloom's accusation of disparate treatment is without support.  The Court agrees.

Under the Civil Service Reform Act, an employee may establish a prima facie case of discrimination by showing that she was treated less favorably than a similarly situated employee who is not a member of her protected class.  *See Buckler v. Fed. Ret. Thrift Inv. Bd.*, 73 M.S.P.R. 476, 497 (1997).  Here, Bloom can make no such showing.  Defendants concede that Bloom's gender places her in a protected class, but rightly points out that Bloom has not identified any similarly situated comparators outside of her protected class who were punished less harshly than she was for similar conduct.  Accordingly, Bloom's affirmative defense fails, and defendants are entitled to summary judgment on Count V of Bloom's complaint.[15]

---

[14]      Provocation is a mitigating factor under *Douglas.*  5 M.S.P.R. at 305.

[15]      In granting summary judgment on Bloom's CSRA claim in favor of defendants, the Court notes that Bloom makes a number of arguments regarding the need for "proper

**C.     Bloom's Sex Discrimination Claim (Count III) Is Dismissed**

Count III of Bloom's complaint alleges that Bloom experienced discrimination based on sex in violation of Title VII.  *See* 42 U.S.C. § 2000e-16(a) (requiring federal employment decisions to "be made free from any discrimination based on . . . sex").[16]  Defendants argue that Count III should be dismissed because Bloom has not alleged that she experienced an adverse employment action.  Defs.' Mem. at 10–11.  The Court agrees that Bloom has failed to state a disparate treatment claim, but for a different reason.[17]

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

---

discovery" in her opposition.  *See* Pl.'s Opp'n at 53–58.  None of Bloom's arguments, however, relate to how additional discovery would yield evidence relating to the events of December 19, 2003 that were the basis of the lack of candor charge, nor what effect additional discovery would have on substantiating her affirmative defense of discrimination by yielding comparator evidence.  Accordingly, even if the Court were to construe Bloom's arguments as a request for additional discovery under Federal Rule of Civil Procedure 56(d), Bloom would fail to show "why discovery [i]s necessary" on this particular claim.  *See Strang v. U.S. Arms Control & Disarmament Agency,* 864 F.2d 859, 861 (D.C. Cir. 1989) (finding that the plaintiff did not justify delaying summary judgment so she could engage in further discovery where she had not given the district court any "reason to question the veracity" of the defendants' evidence and "her plea [was] too vague to require the district court to defer or deny dispositive action").

[16]     Although Count III includes allegations suggesting both that Bloom was subjected to disparate treatment based on her sex and that she suffered sexual harassment, the Court treats the allegations of sexual harassment as part of Bloom's hostile environment claim (Count I, discussed below).

[17]     Defendants are correct that Bloom must present allegations suggesting that she experienced an adverse employment action, but not, as he suggests, because Bloom must plead a prima facie case.  The Supreme Court has explained that "an employment discrimination plaintiff need not plead a prima facie case of discrimination."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010) (collecting cases holding that *Swierkiewicz* survived *Twombly* and *Iqbal*).  Rather, Bloom must do so because an adverse employment action is also an "essential element[]" of a disparate treatment claim.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 761 (1998); *accord Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).  The employee

must "experience[] materially adverse consequences affecting the terms, conditions, or privileges

of employment or future employment opportunities such that a reasonable trier of fact could find

objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  "For

employment actions that do not obviously result in a significant change in employment status . . .

an employee must go the further step of demonstrating how the decision nonetheless caused . . .

objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009).

Here, Bloom identifies four distinct actions as being "targeted" at her but not her male

counterparts.  First, Trombecky "insisted" that Bloom provide a fixed schedule indicating her

arrival and departure times, even though her male colleagues were not required to do so.  Compl.

¶ 123.  Second, Trombecky instructed Bloom to sign in and out on a timesheet to account for her

arrival, departure, and lunch breaks, and to report to Trombecky anytime a meeting went longer

than expected.  Compl. ¶ 124.  Third, Trombecky and Elliott denied Bloom's request to attend a

conference even though two male colleagues were permitted to go.  Compl. ¶ 125.  Finally, the

management team refused to change Bloom's job title from "facilitator" to "strategic planner" as

required by a Permanent Change of Station (*i.e.*, an official reassignment) that she received in

2002.  Compl. ¶¶ 10, 25, 126.[18]

---

[18]    Bloom also describes inappropriate and harassing behavior on the part of
Trombecky's husband at a pair of parties in 2002.  Compl. ¶¶ 118–122.  But Trombecky's
husband was not a Corps employee, these events did not occur at work, and there is no
suggestion that they had any had any employment-related consequences.  Thus, they cannot
constitute adverse employment action; however, as discussed further below, the Court considers
these allegations to be part of Bloom's separate hostile environment claim.

Trombecky's instructions to follow certain scheduling practices do not rise to the level of adverse employment action.  Bloom makes no allegations suggesting that these instructions "caused . . . objectively tangible harm," *Douglas*, 559 F.3d at 552, or otherwise impacted her employment status.  At most, these instructions constituted an inconvenience to Bloom.  *See Zelaya v. UNICCO Serv. Co.*, 733 F. Supp. 2d 121, 129–30 (D.D.C. 2010) (finding that, inter alia, the removal of the plaintiff's fifteen-minute break and the assignment of an employee to monitor her were "minor inconveniences and alteration[s] of job responsibilities [that did] not rise to the level of adverse action necessary to support a claim." (quoting *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009)) (first alteration in original) (internal quotation marks omitted)).  For the same reason, the denial of Bloom's request to attend a conference is not adverse.  *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 89 (D.D.C. 2009) (holding that "denial of travel to conferences is not an adverse employment action" because it has no material consequences).

Conversely, Bloom's final allegation—that managers refused to change Bloom's job title to reflect her reassignment—does plausibly suggest that Bloom experienced adverse action.  Although defendants rely on Bloom's assertion that "strategic planner" is a "more distinguished and prestigious" title than "facilitator," Compl. ¶ 36, to argue that Bloom alleges a mere "bruised ego," Defs.' Mem. at 11, the Court disagrees.  Construed in her favor, Bloom's complaint plausibly alleges that she was denied a title that confers a professional benefit.  Indeed, courts in this district regularly conclude that personnel actions do not constitute adverse action where the plaintiff has shown "no effect on [her] grade or salary level, *job title*, duties, benefits or work hours."  *Runkle v. Gonzales*, 391 F. Supp. 2d 210, 225 (D.D.C. 2005) (emphasis added); *accord*

21

*McGrath v. Clinton*, 674 F. Supp. 2d 131, 147 (D.D.C. 2009); *Harris v. Potter*, 310 F. Supp. 2d 18, 21 (D.D.C. 2004); *see also Keith v. Duffey*, 77 F. Supp. 2d 46, 51 (D.D.C. 1999) ("It would be inconsistent to hold that Title VII did not provide protection against allegedly negative changes in plaintiff's position title and duties when it protects against less concrete actions such as a low performance rating."). Accordingly, the Court concludes that Bloom has alleged an adverse employment action.

Nevertheless, Bloom's complaint fails to state a claim of disparate treatment. Although Bloom has alleged an adverse action, she presents no facts that would allow the Court to reasonably infer the presence of the other "essential element" of a disparate treatment claim: that the adverse action was taken "because of the plaintiff's . . . sex." *Baloch*, 550 F.3d at 1196. The paragraphs of Bloom's complaint describing her job title dispute state that none of Bloom's male counterparts held the "facilitator" title that she was allegedly forced to keep. Compl. ¶¶ 125–126. But that assertion alone is insufficient to "nudge[] [Bloom's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. There is no suggestion that any of Bloom's male colleagues were ever granted a title change pursuant to a Permanent Change of Station (or for any other reason). Nor are there any allegations suggesting that Bloom was denied a title change *because of* her gender. Although a complaint need not contain detailed factual allegations, it must recite facts sufficient to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555. As to this claim, Bloom's complaint fails to do so. *See Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997) ("Dismissal under Rule 12[(c)] is proper when, taking the material allegations of the complaint as admitted, and construing them in plaintiffs' favor, the

court finds that the plaintiffs have failed to allege all the material elements of their cause of action." (internal citations omitted)).

### D.   Bloom's Retaliation Claim (Count II) Is Dismissed

Defendants next argue that Bloom's complaint fails to state a claim of retaliation under Title VII because the activity that allegedly spurred retaliation against Bloom was not "protected activity" within the meaning of the statute.  Defs.' Mem. at 12.  Title VII prohibits employer reprisals in response to two types of protected activity: opposition activity, *i.e.*, opposing "any practice made an unlawful employment practice by" Title VII; and participation activity, *i.e.*, making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII.   42 U.S.C. § 2000e-3(a); *see Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 129 S. Ct. 846, 850 (2009).  To state a Title VII retaliation claim, a plaintiff must allege materially adverse action in response to one of these types of protected activity.  *See Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).

Bloom's complaint alleges that she has experienced retaliation "since lodging her first complaint between January 21–24, 2003."  Compl. ¶ 91.  That first complaint was prompted by Trombecky's behavior at a conference, where she "subjected Ms. Bloom to harassment."  Compl. ¶¶ 37–38.  Even when taken as true and construed in her favor, these bare allegations are insufficient to establish that Bloom complained of conduct that is unlawful under Title VII.  A complaint that "alleges harassment generally and generically . . . [and does] not refer to harassment . . . based on . . . [a] protected category" is not protected oppositional activity under Title VII.  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 92 (D.D.C. 2006) (first omission and first alteration in original) (internal quotations marks omitted); *cf. Middlebrooks v.*

*Godwin Corp.*, 722 F. Supp. 2d 82, 89–90 (D.D.C. 2010) (dismissing a § 1981 retaliation claim because the plaintiff, who described reporting unsafe or unlawful behavior but not race discrimination, had not engaged in protected activity). Bloom's complaint neither alleges that Trombecky's harassment was based on a protected characteristic nor that Bloom reported it that way. *See* Compl. ¶¶ 37–38. There is thus no basis for the Court to conclude that Bloom's complaint constituted protected activity. Accordingly, Bloom has failed to state a claim of retaliation under Title VII.

**E.      Bloom's Hostile Work Environment Claim (Count I) is Dismissed**

Finally, defendants seek the dismissal of Bloom's hostile work environment claim. A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) (internal quotation marks and citation omitted). To determine if that is the case, courts consider all relevant circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Curry v. District of Columbia*, 195 F.3d 654, 662 n.16 (D.C. Cir. 1999) (quoting *Harris*, 510 U.S. at 23).

Here, Bloom's complaint describes a welter of incidents that, she alleges, constituted "ongoing and continual harassment in violation Title VII." Compl. ¶ 88. There is, however, one glaring omission: allegations connecting any of the alleged incidents to Bloom's gender or to any

protected activity.  A hostile work environment is not a stand-alone cause of action under Title VII; a plaintiff must either make out "some linkage between the hostile behavior and the plaintiff's membership in a protected class," *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009); *see also Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003), or establish a connection between the hostile environment and a protected activity.  *See Hussain v. Nicholson,* 435 F.3d 359, 366 (D.C. Cir. 2006) ("In this circuit, a hostile work environment claim can amount to retaliation under Title VII.").  Bloom fails to do either.

The only allegations in the complaint that arguably link any specific conduct to Bloom's gender are those describing the harassment she experienced at the two holiday parties in 2002. Bloom asserts that Trombecky's husband engaged in inappropriate and sexual verbal and physical contact with Bloom.  *See* Compl. ¶¶ 27, 32–33.  But these incidents did not occur at work and did not involve a coworker.  Bloom has thus failed to state a plausible claim that she experienced gender-based harassment sufficient "to alter the conditions of [her] employment and create an abusive *working environment*."  *Harris*, 510 U.S. at 21 (emphasis added).

Similarly, Bloom fails to connect any of the incidents she describes to any protected activity so as to state a retaliatory hostile environment claim.  Not only does Bloom fail to aver a direct causal connection between the two, but she also presents no allegations plausibly suggesting that the harassment of which she complains either commenced, *see Nichols v. Truscott*, 424 F. Supp. 2d 124, 141 (D.D.C. 2006), or worsened, *see Powell v. Lockhart*, 629 F. Supp. 2d 23, 49 (D.D.C. 2009), after she engaged in any protected activity.  Simply put, Bloom has failed to present any allegations that would allow the Court "to draw the reasonable inference" that she experienced a hostile environment *because* she engaged in activity protected

25

by Title VII.  *See Iqbal*, 129 S. Ct. at 1949.  Accordingly, she has failed to state a claim of

hostile-environment retaliation.

## IV.  CONCLUSION

For the foregoing reasons, on this 6th of December 2011 the Court grants defendants'

motion to dismiss in part and for summary judgment. An appropriate order accompanies this

memorandum opinion.

Royce C. Lamberth
Chief Judge
United States District Court
                for the District of Columbia